UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
MONICA SACCO,                                                    :     Case No.          -CV-____
                                                                :
                    Plaintiff,                                  :     **COMPLAINT WITH**
                                                                :     **JURY DEMAND**
          -against-                                             :
                                                                :
CINTAS CORPORATION,                                             :
                                                                :
                    Defendant.                                  :
------------------------------------------------------------------ X

          Monica    Sacco    alleges    against    Defendant    Cintas    Corporation    ("Cintas"):

## THE NATURE OF THE ACTION

1.        Sacco brings this civil action for damages and remedies against her former employer, Cintas, to redress Cintas's unlawful employment practices, including their unlawful discrimination and retaliation against Sacco, in violation of:

          (1)     Title VII of the Civil Rights Act of 1964, as amended ("Title

                  VII");

          (2)     the Americans with Disabilities Act, as amended, 42 U.S.C.

                  §§ 12101 et seq. ("ADA");

          (3)     the New York State Human Rights Law (the "NYSHRL");

          (4)     the New York City Human Rights Law (the "NYCHRL");

                  and

          (5)     the New York Labor Law.

2.        Sacco alleges Cintas discriminated against her based on her sex and disability status and her association with disabled persons—her parents. Sacco also alleged that Cintas failed to

accommodate her disability. Sacco further alleges that Cintas retaliated against her for engaging in protected activity.

3. Additionally, Sacco faced a hostile work environment created from sexist comments that Sacco was "having sex with the sales team," which Cintas allowed to fester.

4. Sacco also faced a hostile work environment based on her disabilities, which were belittled and preyed upon at Cintas. Her manager, for example, knowing Sacco suffered from anxiety, maliciously tried to cause Sacco fear by stalking her whereabouts and putting his business card on the window of Sacco's vehicle, suggesting that Sacco was someplace she should not have been when she was rightfully at a known side job she held at Fitness Incentive.

5. Throughout Sacco's career at Cintas, she was well-qualified for the positions she held and performed her duties in a professional and competent manner.

6. Despite her exemplary performance, on December 20, 2021, her employment with Cintas was terminated.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights under the ADA and Title VII, and the principles of supplemental jurisdiction under 28 U.S.C. § 1367.

8. Venue is proper under 28 U.S.C. § 1391(b)(2) as the Southern District of New York is the judicial district in which a substantial part of the events giving rise to Sacco's claims occurred.

9.      Sacco timely filed a Charge of Discrimination against Cintas with the Equal Employment Opportunity Commission ("EEOC") alleging sex- and disability-based discrimination and retaliation for engaging in protected activity.

10.      Sacco files this complaint within ninety days of receiving a notice of right to sue from the EEOC.

## THE PARTIES

11.      Sacco was employed at Cintas starting on October 2, 2015, and ending on December 20, 2021.

12.      Sacco specifically worked as a Service Sales Representative ("SSR").

13.      Cintas is an American corporation which supplies a range of products to businesses.

14.      Cintas operates throughout the United States, including in New York.

15.      Sacco is a 37-year-old woman who lives in Suffolk County, New York.

16.      Sacco began as an SSR in a sales route bordering Nassau and Suffolk counties in New York.

17.      After she was promoted, her service area included New York City.

18.      Throughout Sacco's employment at Cintas, she was well-qualified for the positions she held and performed her duties in a professional and competent manner.

19.      Despite being an exemplary employee, Cintas discriminated against Sacco because of her sex and disability and retaliated against Sacco for complaining.

**FACTUAL ALLEGATIONS**

1.   **On October 4, 2015, Elliot Abzug And Joseph Tomasello Hired Sacco.**

20.   On October 2, 2015, Elliot Abzug, Service Manager Captain, and Joseph Tomasello, General Manager, hired Sacco as a Service Sales Representative ("SSR").

21.   The SSR position includes running Routes, which means driving the Cintas company van to service existing customers in the assigned areas as scheduled (bi-weekly, monthly, bi-monthly or for special deliveries), and providing them with stock such as first aid products and personal protective equipment ("PPE"), checking existing eyewash stations, and automated external defibrillators ("AED"). SSRs would also help customers with like arranging safety trainings.

2.   **On April 6, 2016, Sacco Began As An SSR For Route 1, A Sales Route Bordering Nassau And Suffolk Counties In New York.**

21.   On April 6, 2016, Sacco began as an SSR for Route 1, a sales Route bordering Nassau and Suffolk Counties in New York. It became her responsibility to maintain Route 1 business and to upsell products by adding AEDs, first aid products, safety trainings, eyewash stations, or anything else the customers needed to maintain their business. This would, in turn, generate revenue for the company, as well as sales commissions.

22.   On May 1, 2016, due to Cintas's acquisition of Zee Medical Inc. ("Zee"), a deal that closed in 2015, the Hicksville, Long Island office, named Location 793, began implementing changes that included hiring new Managers, new SSRs and new a Sales Manager (who was later fired). Cintas also hired a Manager from Zee to be a Manager.

23.   Cintas doubled in size due to this acquisition.

24.    At this time, due to Cintas's growth, Sacco took over an additional sales route, Route 11. Route 11 included the areas of Farmingdale, Syosset, Melville, Massapequa, Northport, Greenlawn, and Old Westbury. This route was small but held potential. It needed a lot of cleaning up as Cintas inherited it from Zee.

25.    At this point, Sacco was the only SSR running two different Routes. She was also the only female SSR. All other SSRs were men.

### 3.    On May 13, 2017, Mike Ebert, Sales Manager, Promoted Sacco To Account Executive.

26.    On May 13, 2017, Mike Ebert, Sales Manager, promoted Sacco to Account Executive. This was a new position within Location 793, as well as within the sales organization for the New York Metro 793 location. The role of Account Executive included managing a book of business with the top 200 customers (those who bought the most product / services from Cintas). This book of business is typically valued around $1,000,000.00, and Sacco's role was to maintain this venue, as well as to try to grow the book's value.

27.    June 1, 2017 was the start of Cintas's 2018 fiscal year.

28.    During fiscal year 2017, Sacco was the SSR with the lowest accounts receivable ("AR") in Location 793. Sacco, however, was the only SSR out of at least 17 to hit Winners Circle.

### 4.    On June 1, 2018, Cintas Awarded Sacco Account Executive Rookie Of The Year, For The First Aid & Safety Division—A Company-Wide National Recognition.

29.    On June 1, 2018, Cintas awarded Sacco Account Executive Rookie of the Year for the First Aid & Safety Division —a company-wide national recognition.

30.    Sacco finished as the 5th Account Executive in the country, in terms of highest revenue generated, and Cintas categorized her as a "Diamond Level Representative."

31. Due to her performance, in August 2018, Cintas awarded her a trip to Marco Island, Florida.

32. Cintas also awarded her stock based on her performance.

### 5. On April 20, 2020, Cintas Put Sacco On Furlough.

33. On April 20, 2020, Cintas put Sacco on furlough, due to the Covid-19 pandemic. Cintas shut off her email access that morning, even though she was still working.

34. Sacco called Cintas's Information Technology Department ("IT") to report the problem and was told to contact her manager.

35. Sacco then called Mike Ebert, her Sales Manager, to let him know that her email was not working, that she had called IT, and that IT told her to contact him. Ebert rushed her off the phone, which was very odd, because he was usually extremely helpful to her. If she had experienced an issue before this, he would typically stop what he was doing to help her, and make the right calls, or send emails to get answers.

36. Around 3:00 p.m., on April 20, 2020, Ebert sent Sacco an invite to speak, via Microsoft Teams. It was during this call that Ebert, and her Director of Sales, Adam Lewicki, put her on furlough. All other Account Executives in the Northeast region (which includes New York, New Jersey, Massachusetts, Connecticut, and Pennsylvania) were also put on furlough.

### 6. The Furlough Ended, And On May 18, 2020, Sacco Returned To Work As An Account Executive.

37. The furlough ended, and on May 18, 2020, Sacco returned to work as an account executive. On May 18, 2020, there was a meeting regarding how to select their book of business, and that it would be due on May 22, 2020. During the book of business selection process, Cintas sent data regarding about 400 customers from which Sacco needed to choose 200. This gave her

6

only one week to put together a book of business for 200 customers for the upcoming Fiscal Year 2021.

38.    A lot of customers were closed due to the pandemic, so they had to make calls to their Service Managers and SSRs to see which customers were open and which were closed. They also needed to find out if and when closed customers were planning to re-open. They needed to find out if they were operating via work from home arrangements or letting workers on site. They also checked on whether the SSRs and Service Managers spoke to customers about any large PPE purchases.

39.    On June 1, 2020, Cintas awarded Sacco "MVP Northeast Account Executive."

40.    On August 3, 2020, Ebert and Sacco texted about doing a review for a customer, attempting to keep large business with the customer.

41.    On August 31, 2020, Abzug and Sacco spoke on the phone about Mike Grassi, an SSR. Jason Sikora, General Manager, was also on the phone. They were discussing the fact that Grassi was being extremely difficult to work with, not responding to Sacco's emails, her text messages, or her phone calls.

42.    At one point during this call, Sikora criticized Sacco for not returning Mike Grassi's calls from the previous late Friday afternoon. When Sacco became furious about this untrue criticism, Sikora told her to "calm down," and said Sacco should have been better at answering Grassi's call because how did she think that made Grassi feel. The reality is Sacco had been nothing but supportive of Grassi for the two years he was at Cintas up to this point. Sacco always had his back and went above and beyond for him. Also, she always aimed to return calls within 25 minutes to an hour.

43.    Sacco had been in repeated contact with Grassi since June, and she complained to his manager, Abzug, on a weekly basis about how Grassi was not communicating with her. Sacco believes she was being attacked in this way because she is a woman, Grassi was not attacked for his behavior, because he is a man.

44.    Grassi, a man, behaved much worse towards Sacco, and she complained about it. However, no one at Cintas ever reprimanded Grassi, to her knowledge, for his demeaning behavior directed at her. Cinta's published culture was to treat everyone in the company, whether a director or an employee socking the warehouse, with the same level of respect—each employee was called a "partner." Grassi did not treat Sacco this way and she believes Cintas did not discipline him because he is a man.

**7.    On September 20, 2020, Sacco Met With Ebert And Sikora For The Presentation Of Her Five-Year Anniversary Glass Plaque.**

45.    On September 30, 2020, Sacco met with Ebert and Sikora for the presentation of her five-year anniversary glass plaque, and to celebrate her upcoming milestone.

46.    On October 1, 2020, Todd Gallose replaced Ebert as the Sales Manager of the New York Metro area 793 location.

47.    On October 4, 2020, Sacco celebrated her five-year work anniversary at Cintas.

48.    On October 8, 2020, Lewicki texted Sacco to let her know he was going to schedule a meeting with her for October 9, 2020, so that they could discuss "great news."

49.    At the October 9, 2020 meeting, Lewicki and Sacco discussed moving Sacco, along with five other Account Executives who were not doing well due to the market conditions and the ongoing Covid-19 pandemic, to a new pilot role—later called a Business Development Specialist.

8

The five other Account Executives being moved were based in Massachusetts, California, Texas, Pennsylvania, and Ohio.

50.    The market in the New York Metro area, which includes Long Island, Queens, Brooklyn, Long Island City, and New York City, was difficult to sell to as companies were not fully staffed and were afraid to spend money. This was also the case in the areas from which the other five Account Executives were based.

51.    Cintas represented that this role would be more lucrative in terms of sales, than the Account Executive role.

**8.    On October 12, 2020, Sacco Met With Sikora To Discuss The Panic Attacks And Migraines She Was Experiencing.**

52.    On October 12, 2020, Sacco met with Sikora to discuss the panic attacks and intense migraines she was experiencing.

53.    Sacco told Sikora she was worried about her book of business, Covid-19 and its effect on her business, her reputation of success for which she worked very hard to attain, and her income.

54.    Sikora suggested Sacco speak with Melody Ramirez of Cintas's Human Resources Department ("HR") about the possibility of taking Intermittent Leave.

**9.    On October 13, 2020, Sacco Spoke With Kristy Gordley, Human Resources Director Of The Northeast, About Her Performance, Book Of Business, And Personal Struggles With Her Disabled Father, All Sources Of Extreme Anxiety For Her.**

55.    On October 13, 2020, Sacco spoke on the phone to Kristy Gordley, Human Resources Director of the Northeast, regarding her performance, her book of business, and how her father was beginning to lose his memory. At the time of their conversation, Sacco was

9

experiencing incredible anxiety over her career. At Cintas, those in Sales can choose their book of business. At this time, due to Covid-19, it was incredibly difficult to choose customers because of the state of the world, and the economy, and the fact that no one knew what the future held. She should have hit Presidents Club level sales in May 2020, but Covid hit. She explained to Gordley that she had always been an overachiever, and that she always had financial and career goals, and she was not achieving these goals, and it terrified her.

56.     It is a known fact at Cintas that if you are not hitting your sales numbers, you can be written up, and penalized. At this time, for Sacco and those in her position, success was a hit or miss due to the vastly differing markets in different geographical regions. A Partner in the San Francisco, California market was having just as difficult a time as Sacco, all due to the Covid-19 pandemic.

57.     Sacco loved working at Cintas. She was truly afraid of losing her job and of damaging her reputation that she had worked very hard to build. She knew that she was also being very hard on herself, but she loved working and overachieving. Winning was a high for her. All these thoughts were running through her mind when speaking with Gordley, and she tried her best to make it clear to Gordley the amount of stress and anxiety from which she was suffering.

58.     Gordley shared her own battles with anxiety and how she used prescription medicine to treat it. She comforted Sacco and told her that she would be okay.

59.     On October 26, 2020, Ramirez and Sacco finally spoke on the phone, and texted about her taking intermittent leave.

60.     Ramirez actually tried explaining the process of taking intermittent leave to her over the phone a few times. Sacco told Ramirez that her leave needs might include being out of work for migraines for maybe 2-3 hours, to maybe needing a later start to her day, or to end her

day early—it would vary. What she needed as an accommodation was flexibility. Ramirez would reject her request and criticize it as not being specific enough. Thus, Sacco never took the intermittent leave—the reasonable accommodation for her disability—she had requested.

61.     On October 29, 2020, Sacco had to file a police report for her elderly father because someone had committed identity theft using his information.

62.     Sacco made her entire team aware of this during a team meeting. Sacco also spoke to Gallose during their one-on-one meeting, telling him she needed to take off from work to handle the identity theft paperwork. He asked her "Why do you have to take off on a Friday?" Sacco avoided addressing his Friday comment and told him she was overwhelmed and anxious about dealing with everything.

63.     On November 1, 2020, Gallose and Sacco spoke about her migraines and anxiety, and she told him she had investigated taking intermittent leave—an accommodation for her disabilities. He already knew, however, that she had spoken to the human resources department ("HR"), Melody Ramirez and Sikora about intermittent leave, and he actually made the comment during their conversation: "I'm the sales manager, I know everything."

64.     On November 11, 2020, the pilot position discussed in October 2020 went live, and Sacco became a Business Development Representative ("BDR").

**10.     <u>On May 3, 2021, Sacco Had A Colonoscopy And Two Polyps Were Found.</u>**

65.     On May 3, 2021, Sacco had a colonoscopy done and two polyps were found. She was bleeding from her anus. At just younger than her then age of 34, her mother was diagnosed with colon cancer. The doctor told Sacco that if she had waited six months to a year the one larger polyp probably would have developed into cancer.

66.    Gallose was aware that Sacco had this procedure because she took medical leave using Paid Time Off ("PTO") and Gallose was aware she took such leave.

67.    The week of May 25, 2021, she took another medical leave to have required surgery and used four days of PTO.

68.    Gallose was also aware of this surgery and this medical leave.

69.    At the close of the fourth quarter of Cintas's 2021 Fiscal Year, even though she had taken medical leave during this time, Sacco hit her sales goal and was awarded a bonus.

**11.    The First And Second Quarters Of Cintas's Fiscal Year 2022 Brought More Problems For Sacco, Including A Junior Colleague Shockingly Telling Her Abzug Had Said She Was "Having Sex With The Sales Team," Having To Take Leave For Her Own Health Issues, Including Covid-19, And For Her <u>Mother.</u>**

70.    In June 2021, at the start of the first quarter of Fiscal year 2022, Sacco told Gallose she was still having problems with her anxiety and migraines. Gallose then shared a story of his neighbor's son who attempted suicide. This story was very overwhelming for Sacco because in January 2021, Sacco was chronically depressed and had suicidal thoughts.

71.    In July 2021, Gallose said to Sacco, regarding her side job at Fitness Incentive, something to the effect that it was hard for him to get the Service Managers on board with her if they knew she was teaching classes and taking naps in the middle of the day.

72.    Sacco laughed because due to Covid-19, Fitness Incentive had very few classes and was closed from 11:00 a.m. to 4:00 p.m. She had taught five classes weekly before Covid-19 hit, but after she was now teaching only one class, on Tuesdays, at 6:00 p.m.

73.    Sacco said she had taken some short naps (in her car, at her apartment, in a dark, empty office at Cintas) only because of the terrible migraines she was suffering from—which he

knew about. Sacco's migraines were widely known, and she only told people about them because they made her essentially non-functional. She would become nauseous and lose her eyesight.

74.    Sacco also shared that she saw an acupuncturist to treat her migraines and anxiety. She shared this information with Todd Gallose, Vic Barsotti, Christina Harris, Jimmy Wolfong, Ryan Buckley, Lindsay Bergin, John Leto, Elliot Abzug, Jason Sikora, Steve Edwards, and Bridget Fougere.

75.    On July 17, 2021, Sacco saw a Management Trainee, Allysun Adams, on Fire Island and she disclosed that Abzug had said she was "having sex with the sales team."

76.    In August 2021, Sacco was sick with Covid-19 and went on leave for 10 working days, which was the requirement for isolation at that time.

77.    On September 10, 2021, Sacco's mother had surgery to remove a tumor from her face, and Sacco was her caretaker. Sacco took PTO to care for her. Gallose was aware of her mother's surgery and her leave.

78.    On September 17, 2021, Sacco had an Intrauterine Device ("IUD") put in.

79.    On September 20, 2021, Sacco called Gallose and explained she could not come to work due to pain. She was not sure if the IUD had shifted out of place, or if she had a urinary tract infection. She was up the night before for hours in pain, and even thought about going to the emergency room. It was very abnormal.

80.    She was able to get an appointment with her OB-GYN at 1:30 p.m., on September 20, 2021. It turned out that the IUD had, in fact, shifted out of place.

81.    She later told Gallose the reason for her pain only because he asked.

82.    On September 21, 2021, Sacco attended a Coffee Talk with Gordley. During a Coffee Talk, HR is open to discuss how everything is going, including leadership, job duties, how

Cintas can improve, issues with coworkers, or issues with one's own position. Normally a Coffee Talk would take place in a group setting, but this was a one-on-one, due to Covid-19. Other partners also had one-on-ones.

83.   Sacco was ten minutes late for the meeting because she had not been feeling well, which she explained to Gordley.

84.   During this meeting Gordley asked her how everything was going with her new role in Business Development—the pilot role that her and five others were moved to in November 2020. Sacco responded, "It's going okay, it's been hard, I could be working harder." It was going just okay for multiple reasons. She still did not have support from Service Management Team, which had been a longstanding issue and was isolated to her.

85.   For example, Gallose, Sacco's manager, said he supported her, yet few of her ideas were ever executed. The largest of which was the roll out of a sales contest to keep the Service Managers and the SSRs engaged. This contest was designed to make her position more successful, to make their location more successful, and to make her more successful. Gallose continued to tell her he was going to roll it out, but he never followed through.

86.   It was very challenging for Sacco to hit her bonus and goal for the first quarter of Fiscal Year 2022. The pandemic continued to hinder how their customers spent money, whether they were in the office part-time, full-time, or even at all. During the summer of 2021 most customers were facing the same issues, and the SSRs were struggling to sell, navigating who was open, who had money to spend, etc. Sacco was trying very hard and doing her best to sell. She really put herself out there. It was exhausting for her.

87.   Gordley then said to Sacco that she knows her dad has some health issues, and she asked how he was doing. Sacco had told her about her father's poor health because she was nervous

14

about not hitting President Club, about her performance, and about her income. She was extremely paranoid of not achieving and of getting fired. Sacco went on to explain that it has been very hard on her. In fact, one of the things Gordley said to her was that she did not look like herself.

88.    On September 29, 2021, Sacco's uncle passed away. Sacco told Gallose and Sacco left work early that day and took intermittent leave for the rest of the day. He died while senior Cintas leadership was visiting Sacco's location, including Gordley, Human Resources, Northeast Director, and Jimmy Lien, the Regional Director of the Northeast.

**12.    On October 4, 2021, Sacco Met With Gallose And Ryan Filipowicz, General Manager.**

89.    On October 4, 2021, Gallose texted Sacco that he needed her to stop by his office by 2:00 p.m.

90.    Sacco got to his office at 12:00 p.m., and Ryan Filipowicz, General Manager, was there.

91.    Gallose did most of the talking. He presented Sacco with a verbal warning and showed her a written copy of what was verbally said to her. Cintas never gave her a copy of this document.

92.    During the meeting, Gallose told Sacco "You didn't help yourself by telling Kristy [Gordley] you weren't working." Sacco was totally taken back by this because this was not true. She told Gordley that she could be working harder, which was true, she could always be working harder. Cintas is known to push, push, push. Sacco's move to the new role was a lateral move (not a promotion as it was advertised), and an unknown one because it was a brand-new position. Sacco made it clear to Gordley that she was already suffering from anxiety and depression prior to the conversation Sacco had with her, the conversation to which Gallose was now referring. Sacco was

suffering from anxiety because she was not reaching her financial goals, such as regarding commissions and bonuses (which she had also mentioned to Gallose in the past), and because she felt like she was on an island alone as usual.

93. Gallose then raised the issue about Sacco's performance, specifically that she was not hitting her numbers as well as other Business Development Representatives were. He compared her to the male Massachusetts Business Development Representative, Zachary Donahue, who was doing well. But Donahue's region was better than hers because it covered more open business. Donahue was able, for example, to travel a close distance to New Hampshire, which was not as shut down as Sacco's area.

94. She also indicated to Gallose that customers were not buying and that other partners at Cintas, across positions, were also having difficulty because so many of the customers were cutting back.

95. Gallose also compared her to the New Business Sales Representatives on their team and commented on how great they were doing.

96. Sacco explained to Gallose that they were allowed to sell all products. The New Business Sales Representatives were also allowed to do "resets" under standard guidelines. A reset is a process by which a New Business Sales Representative can, if a customer does not receive service from Cintas First Aid & Safety more than three months, sign the customer back up automatically, and get credit for what the customer then bought.

97. Gallose singled her out, and compared her to others who were doing well, however the partners he was comparing her to were in different positions with different measurements of success.

98. For example, Greg Jew, the California Sales Representative, with the same Business Development role as her, was having a very challenging time as well. Jew and Sacco often texted with each other about how their respective regions are different from other parts of the country. His and her regions were in typical "Blue" states. Other partners' regions were in typical "Red" states, meaning more open offices, and back to "business as usual" when compared to the much more cautious Blue states. The reality was that politics influences sales—a fact Sacco tried to explain to Gallose.

99. During this meeting Sacco also explained that her "hard work as an Account Executive for a year and half [was] now finally closing on Beth (Quinn's) book." Beth Quinn was a Training and Compliance Partner and had been with Cintas about a year and a half longer than Sacco. Quinn did not have a disability to Sacco's knowledge and was very successful in her previous position. They worked great together. There were deals Sacco was working on, that Quinn got credit and compensation for.

100. Gallose was very nonchalant in response to this information and glazed over it. This was extremely upsetting to Sacco as she was not getting recognition from anyone that most of Quinn's success was due to her work and her sales.

101. The SSRs even had a policy where if a sale closed on their route within a 3-month window they were able to be paid (or at least split the pay) even though they would not "get credit" for the sale. They got money for the sale and for the work they put into the sale. Sacco felt like she too should get paid for her success and hard work even if not recognized or put towards credit for her bonus or towards her new position.

102. Part of the verbal warning, according to Gallose, was the fact that an SSR reported to senior leadership that he "did not feel comfortable with you [meaning Sacco] at their customers

because you said, 'if you have a problem with uniforms I don't want to hear about it.' " Sacco explained to Gallose this was a joke / icebreaker, she often used at the beginning of conversations with customers. Sacco went on to explain to Gallose that when she introduced herself as part of First Aid & Safety, she would say something like "Hi I'm Monica with the Cintas First Aid and Safety division. If you have any questions about our other divisions (uniforms, facilities, etc.), I don't know them, so I cannot help you! They are too big for us!" She told Gallose that she of course switched up verbiage because all customers and all situations are different. Sacco also explained that 99% of the time this type of opening would make customers laugh.

103. Sacco started to cry during this meeting. She explained that she was trying the best she could, that she had asked for help, and that things had been difficult both professionally, and personally.

104. Gallose dismissed Sacco and said something to the effect that what she was going through was a great opportunity for her to dive into her work, and work harder, as an escape. This is one of many times Gallose said this type of thing to Sacco. Every time Sacco told Gallose that she needed help, she felt like he thought she was being lazy—despite her stellar track record—when in fact she really needed help and accommodation. Sacco believes Gallose was under the impression that her previous manager did everything for her, but he did not.

105. Unlike Sacco's peers, there was no official reporting system within her new BDR position to keep track of such things as sales numbers and sales goals. For Account Executives, and New Business Representatives, however, there were reports that could be pulled to manage goals and numbers. Gallose created this Excel reporting system where, in Sacco's old role, Gallose and Sacco could input sales numbers on a daily and weekly basis so that Gallose could see them. In her new BDR role her monthly goals across different categories and her numbers were different

18

than those of the New Business Representatives and Account Executives so she was unable to take advantage of this reporting system at all.

106.    Because Sacco had no system to track these things, Gallose, who is very talented at creating these types of Excel reports, said he would create a reporting system for him and her. The new report was going to detail how many agreements were signed, versus how many needed to be signed, the dollars needed for training, what products were sold, etc. This report was also to be a reference tool for the entire 793 location, from the Service Managers to the SSRs, to the General Manager. In Sacco's position as BDR this would be especially helpful because the agreements she would sign would help the SSRs as a Key Performance Indicator ("KPI"). Gallose never created this tracking system.

107.    Gallose instead presented a very simple Excel document for Sacco to track the customers she was seeing each day, not the detailed document he had promised for months.

108.    Gallose said Sacco had done really well for the fourth quarter of 2021, which for Cintas was March, April, and May 2021. Sacco had met the requirements for being paid a bonus. Sacco acknowledged to Gallose that she had done well.

109.    As Sacco continued to cry, she mentioned all the hardships she had been enduring including her father's ailing health, anxiety, depression, migraines, Covid, two surgeries, her uncle passing away, and her mother suffering from a tumor. Also, she felt no one was working with her as a team, and the Covid-19 pandemic was causing customers not to buy. Sacco felt unappreciated for the part she played in the sales that Quinn was closing. She was not hitting her professional sales goals, and she was devastated about the negative rumors going around about her.

110.    Gallose said "I know you didn't plan on getting Covid, I don't think anyone does." Sacco believes he felt she was using her hardships as an excuse for her performance because he

often compared her to others, in different positions than her. Gallose also lacked compassion. He said he cared about her but never followed through on his words. He was not doing the job of a leader.

111. Gallose had always said that he had her back and was her biggest cheerleader, but this was not true.

112. After this meeting, Sacco steered clear of Gallose, she needed space mentally.

113. On October 14 and 15, 2021, Sacco took PTO, which she had scheduled a few weeks prior, to attend a life coaching program.

114. On October 18, 2021, Sacco texted Gallose around 3:00 p.m. and told him she needed to take medical leave.

115. After she requested leave from Gallose, Ramirez sent her information about taking leave, by email.

**13.    On December 13, 2021, Sacco Returned From Medical Leave And Complained Of Sexual Harassment And Disability Discrimination.**

116. On December 13, 2021, Sacco returned from medical leave and met with Gallose in his office.

117. During the meeting Gallose asked how she was doing, to which she replied that she was doing good and that taking a leave was the best decision she could have made. It helped her heal and gain clarity. He seemed happy hearing this.

118. Sacco told Gallose that back in June 2021, when he shared the story of his neighbor's son almost attempting suicide, his story was very overwhelming for her because she was in the same space in January 2021.

119.    During her medical leave, Sacco was able to prepare herself mentally to deal with the sexual harassment against her. Sacco believes her taking medical leave—an accommodation for her disabilities—caused Cintas to then rate her performance lower than what she deserved and not comporting with her reputation. Prior to July 2021, she made MVP, she was a Diamond Level Representative, a President Club Representative, and Rookie of the Year.

120.    Sacco told Gallose there were a few things she wanted to discuss, one of which was the fact that a partner told another partner that she was sleeping with the sales team and that she found this out over the summer.

121.    Gallose looked shocked and taken back. He asked Sacco if she wanted him to report it and if she felt comfortable.

122.    She said no, she did not feel comfortable and that this partner would continue to do this to her. It was not the first time. There had actually been many times when Abzug made inappropriate comments about her, but she did not tell Gallose because he was not a manager at the time.

123.    There had also been times where Abzug has spoken down to her, and demeaned her in front of other employees, including management. Other employees told her this. No one had ever done anything about Abzug's behavior. Abzug loved to gossip and start trouble but somehow got away with everything. He has done these things to Sacco throughout her entire Cintas career.

124.    Gallose and Sacco discussed how they would go forward and focus on Long Island and the two SSRs who have routes there.

125.    Gallose also mentioned he would speak to another General Manager, at a location on Long Island, to see if there were any job openings there for her. He said something to the effect of, it was okay if this just was not for her anymore. Sacco had not asked for any transfer, however,

and explained that she was tired of babysitting 20 plus Partners to which Gallose said "Monica, we all have to do that, I have to as well."

126.    Sacco added he dropped the ball with the contest that was never launched.

127.    When she told Gallose that she needed help he said, "why didn't you ask?" She told him that she did ask for help, in many different ways. Cintas had failed to engage in the interactive process and had discriminated against her for being disabled.

128.    Gallose told Sacco that he wanted to hear from her at the end of every day and explained that the verbal warning she had received on October 4, 2021 was still in effect. She felt like she was on probation.

129.    Throughout her entire career at Cintas, Sacco was never micromanaged. She always did the right thing because she wanted to succeed, and she wanted her partners to succeed. She always took pride in her work, she always went above beyond what was required of her, both for herself and for her coworkers.

130.    Sacco explained to Gallose that this was hurtful and offensive to which he said that he had heard she never really did anything. Sacco has never forgotten that he said this terribly hurtful thing to her.

131.    When Sacco confronted him about this he said, in his own defense, the previous Sales manager, Ebert, told him this. Ebert was a hands-on, full force manager that wanted everyone to succeed, and would go the extra mile to help. She told Gallose that she did not believe Ebert meant it that way because he never closed any sales for her or prospected for her. He did do other things like complete administrative tasks fast.

22

132.    Sacco explained to Gallose that what he said discredited her hard work, and that this was not the first time a manager tried to diminish her success. Abzug repeatedly would say, "don't let Monica take credit."

**14.    On December 20, 2021, Cintas Fired Sacco One Week After She Returned From Medical Leave—An Accommodation For Her Disabilities—And Three Days After She Gathered The Courage To Complain To Gallose Of Cintas's Sexual Harassment And That She Had Experienced Suicidal Thoughts.**

133.    On December 16, 2021, Sacco arrived at Fitness Incentive around 8:15 a.m. to substitute teach a class that started at 8:30 a.m. Teaching such a class did not affect her Cintas job at all.  She taught from 8:30 a.m. to 9:15 a.m. After the class, she changed and got ready for work in the locker room at Fitness Inventive. When Sacco went out to her Jeep, parked in the parking lot, she saw Gallose's business card on her driver's side window.

134.    Sacco got into her vehicle, waited a few minutes, then called Carlos Rodriguez. Rodriguez told her that he saw Gallose during the morning meeting that day, and that Gallose asked Rodriguez what time he was meeting her. Rodriguez told him he was meeting her at 10 a.m., because he had a safety drop off to a customer at around 9 a.m.

135.    The day before (December 15, 2021), Sacco told Gallose she was meeting Rodriguez at 10:00 a.m. and that she would be getting things done in the morning like reading and sending emails, organizing for her day, etc. So, it is unclear why he asked Rodriguez the same question.

136.    Sacco met Rodriguez around 10:10 a.m. She was a few minutes late because the business card wedged in her car window made her freeze in panic. She called Gallose when she was with Rodriguez because she was scared to call when she was alone. Gallose did not answer her call. She called back again, about 15 minutes later and there was still no answer.

137.   Later this same day, Gallose sent out his usual, daily emails to the 793 location. Sacco knew he was avoiding her, despite having left his business card on her vehicle's window.

138.   Gallose knew she taught at Fitness Incentive, and she was never barred from doing so. Others at Cintas had side jobs that were widely known about as well, and they were allowed to have such jobs.

139.   But just days after she returned from leave—an accommodation for her disabilities—and complained of sexual harassment and disability discrimination, Gallose went out of his way to go to Fitness Incentive to harass and intimidate Sacco, who he knew suffered from anxiety. Working out was of course critical to Sacco's mental health and alleviating the negative effects of her disabilities.

140.   On December 17, 2021, with Gallose avoiding Sacco and not returning her calls, Sacco was extremely scared and suffering from anxiety.

141.   At about 5:00 p.m., Gordley emailed her to make an appointment to "catch up" at 11:00 a.m. on Monday, December 20, 2021.

142.   On Monday, December 20, 2021, Sacco did not attend the 8:00 a.m. onboarding meeting or the 9:00 a.m. sales meeting. She did not attend these meetings because she was in distress, she felt completely uncomfortable and anxious. What Gallose did to her with his business card was a terrible way to treat someone, it was malicious. She wondered if he came to her house.

143.   At 11:00 a.m. on December 20, Gordley and Sacco spoke on the phone. Gordley asked how she was doing, and she dove into the events of the prior Thursday. Gordley told her she was being paid to work by another company (Fitness Incentive) while also being paid by, and working for, Cintas. This is not true, as she had no set working hours at Cintas. Sacco told Gordley that she did also work for Fitness Incentive and asked her what is the difference between her doing

24

this on her lunch break, or with her dropping a child off at school. At Cintas, Sales Representatives work hours beyond 9 a.m. to 5 p.m. and are flexible and free. Never mind the fact that many other Cintas employees had side jobs.

144. Gordley continued to tell her that it was not okay to make money from another company, while at the same time getting paid by Cintas. She mentioned Sacco appeared to have a barrier up due to her tone of her voice. Sacco did this because Gordley had previously deceived her in their one-on-one Coffee Talks.

145. Sacco said "It's okay. I needed the extra money, and they needed me." Gordley said in a strong voice "No, Monica it's not okay."

146. Gordley probed Sacco about how she did not show up for Monday morning meetings and asked if she told her manager Gallose that she was not going to the meetings. Gordley asked her questions about missing these meetings, as well as about whether she worked the past Thursday and Friday. Sacco said she did work on Thursday and Friday, to the best of her ability, but she did not hear from Gallose after he left the cryptic message (the business card) on her car.

147. Sacco eventually broke down in tears and mentioned that Abzug told Allysun Adams she was sleeping with the sales team, and that she knew this because Adams told her over the summer. Gordley was taken back by this. Sacco asked her if Gallose had told her this previously and she said no, he did not mention it.

148. Gordley then said, "so we can say you threw in the towel?" Sacco did not respond. During this meeting, Gordley repeatedly pushed Sacco to resign and made it clear her employment was being terminated. When Sacco finally accepted that her employment was ending, Gordley went into the steps that needed to be taken, but Sacco was so shocked that nothing Gordley said registered with her.

149.    Sacco told Gordley that she wanted to be paid for her unused PTO, to which she replied that it was not a requirement in New York State, and Cintas did not have to do that. Cintas has still not paid her for the correct amount of unused PTO or for certain medical leave she took that Cintas should have paid for.

150.    The next day Cintas cut off Sacco's access to her email.

151.    Sacco was devastated. Work was always her top priority. She worked on vacations, late nights, early mornings, she loved being top dog.

152.    On December 21, 2021, Sacco emailed Gordley:

Dear Mrs. Gordley,

I believe Cintas Corporation has discriminated against me because I am disabled and retaliated against me for taking leave.

Please turn on my access [email] as soon as possible; investigate my complaint; and let me know the next steps.

Sincerely,

Monica Sacco

153.    Gordley did not reply to this email.

154.    On January 10, 2022, Sacco emailed Gordley again:

Dear Ms. Gordley:

Please respond to my below email. I want my job that I have worked hard at for years. Terminating my employment is unlawful.

Sincerely,

Monica Sacco

155.    On January 10, 2022, Gordley replied: "Monica, I've tried to reach you to better understand your concerns.  Please call me at 586-212-1739."

156.    On January 12, 2022, Gordley emailed Sacco again: "Hi Monica, I'm following up again to request you contact me regarding your email below. I do want to reiterate that you voluntary resigned from your position on December 20, 2021. I can be reached at 586-212-1739."

157.    On January 12, 2022, Sacco replied to Gordley: "I did not voluntarily end my employment. You know that. May we speak by Zoom this Friday? May I have an attorney present?"

158.    Gordley replied: "I am available to speak with you by phone on Friday at 9:30 am.  If that works I can call you at that time.  Please provide the best number to reach you."

159.    On January 14, 2022, Sacco emailed Gordley:

I am very disappointed that you will not allow my attorney to participate.

You know I am suffering from anxiety, and you and Todd knew that before our last call. I need support and accommodation, but instead you all have used my disability against me.

In regards to my last few weeks out (I believe 4 weeks), I want to be paid out since I did not get paid through insurance.

Lastly, interview me by email, to accommodate my disability.

160.    On January 19, 2022, Cintas outside counsel sent a letter to Sacco's counsel:

Be advised I represent Cintas Corporation and its subsidiaries, divisions and related entities (collectively "Cintas"). I have received your correspondence directed to Cintas regarding former employee Monica Sacco. Please direct all future correspondence regarding this matter to my attention.

Please feel free to contact me should you have any questions

161.    A good friend of Gallose's, Victor Barsotti, filled Sacco's position. Barsotti had been with Cintas for about 10 years in another position as a New Business Sales Representative

for the Sales Team. He left at one point and started back with Cintas in about February 2019. To Sacco's knowledge, Barsotti is not disabled, and has not taken medical leave.

## CLAIMS

### FIRST CLAIM

**(Sex Discrimination And Harassment Under Title VII)**

162.     Sacco repeats and realleges all of the allegations contained herein, as if separately alleged.

163.     Sacco is an "employee" under Title VII, 42 U.S.C. § 2000e(f).

164.     Cintas is an "employer" under Title VII, 42 U.S.C. § 2000e(b).

165.     By Cintas's actions described herein, Cintas discriminated against Sacco on the basis of her sex by, among other things, terminating her employment, and causing her to working in a hostile work environment where she was sexually harassed, including by the spreading of a rumor that she was "having sex with the sales team."

166.      As a result of Cintas' discriminatory actions, Sacco has suffered significant damages, including lost wages and benefits and emotional distress, in amounts to be determined at trial.

167.     Upon information and belief, Cintas engaged in this discriminatory conduct with malice and reckless indifference to Sacco's federally protected rights. Sacco is therefore entitled to punitive damages under Title VII.

168.     As a result of the discrimination described herein, Sacco is also entitled to injunctive relief of reinstatement, promotion, or front pay in lieu of reinstatement and promotion.

## SECOND CLAIM

### (Unlawful Retaliation Under Title VII)

169.    Sacco repeats and realleges all of the allegations contained herein, as if separately alleged.

170.    Sacco is an "employee" under Title VII, 42 U.S.C. § 2000e(f)

171.    Cintas is an "employer" under Title VII, 42 U.S.C. § 2000e(b).

172.    Sacco engaged in protected activity under Title VII by complaining.

173.    Cintas unlawfully retaliated against Sacco by, among other things, unjustifiably and maliciously trying to cause her fear despite knowing she suffered from anxiety, and terminating her employment.

174.    As a result of Cintas's actions, Sacco has suffered significant damages, including lost wages and benefits and emotional distress, in amounts to be determined at trial.

175.    Upon information and belief, Cintas engaged in this retaliatory conduct with malice and reckless indifference to Sacco's federally protected rights. Sacco is therefore entitled to punitive damages under Title VII.

176.    As a result of the discrimination described herein, Sacco is also entitled to injunctive relief of reinstatement, promotion, or front pay in lieu of reinstatement and promotion.

## THIRD CLAIM

### (Disability Discrimination And Harassment Based On Actual And / Or Perceived Disability In Violation Of The ADA)

177.    Sacco hereby repeats and realleges all of the allegations contained herein, as if separately alleged.

178.    At all relevant times, Sacco was an "employee" of Cintas under Title I, 42 U.S.C. § 12111(4).

179.    Cintas is an "employer" under Title I, 42 U.S.C. § 12111(5).

180.    Sacco had disabilities as defined in 42 U.S.C. § 12102.

181.    Upon information and belief, Cintas, including Gallose and Gordley, perceived Sacco to be disabled.

182.    By its actions detailed above, Defendant Cintas intentionally and unlawfully discriminated against Sacco based on her disabilities and / or perceived disabilities in violation of 42 U.S.C. § 12112.

183.    Among other things, Cintas violated the ADA by subjecting Sacco to a hostile work environment based on her disabilities and / or perceived disabilities, including, but not limited to, unjustifiably and maliciously trying to cause her fear despite knowing she suffered from anxiety, and terminating her employment, in violation of Title I, 42 U.S.C. § 12112(a).

184.    As a direct and proximate result of Defendant Cintas's violation of the ADA, Sacco has suffered and continues to suffer harm for which he is entitled to an award of damages.

185.    Defendant Cintas's unlawful conduct constitutes a knowing, malicious, willful and wanton violation of the ADA for which Plaintiff is entitled to an award of punitive damages.

## <u>FOURTH CLAIM</u>

### (Failure To Reasonably Accommodate And Engage In Interactive Process In Violation Of The ADA)

186.    Sacco hereby repeats and realleges all of the allegations contained herein, as if separately alleged.

187.    At all relevant times, Sacco was an "employee" of Cintas under Title I, 42 U.S.C. § 12111(4).

188.    Cintas is an "employer" under Title I, 42 U.S.C. § 12111(5).

189.    By its actions detailed above, Cintas failed to reasonably accommodate Sacco's disabilities and engage in an interactive process in violation of 42 U.S.C. § 12112.

190.    Sacco seeks back pay and reinstatement or front pay, compensatory damages including for emotional distress, interest, attorneys' fees, and costs.

191.    In addition, because Cintas's conduct against Sacco was done with malice and / or reckless indifference to her rights under the ADA, she seeks punitive damages.

## FIFTH CLAIM

### (Discrimination On The Basis Of Association With An Actually Or Perceived Disabled Person In Violation Of Title I Of The ADA)

192.    Sacco hereby repeats and realleges all of the allegations contained herein, as if separately alleged.

193.    At all relevant times, Sacco was an "employee" of Cintas under Title I, 42 U.S.C. § 12111(4).

194.    Cintas is an "employer" under Title I, 42 U.S.C. § 12111(5).

195.    Sacco's parents are disabled under the ADA.

196.    Upon information and belief, Cintas, including Gallose and Gordley, perceived Sacco's parents to be disabled.

197.    Among other things, Cintas discriminated against Sacco based on her association with her disabled parents by, among other things, terminating her employment.

31

198.    As a direct and proximate result of Defendant Cintas's violation of the ADA, Sacco has suffered and continues to suffer harm for which she is entitled to an award of damages.

199.    Defendant Cintas's unlawful conduct constitutes a knowing, malicious, willful and wanton violation of the ADA for which Plaintiff is entitled to an award of punitive damages.

## SIXTH CLAIM

### (Retaliation In Violation Of The ADA)

200.    Sacco hereby repeats and realleges all of the allegations contained herein, as if separately alleged.

201.    By its actions detailed above, Cintas retaliated against Sacco for opposing Cintas's discrimination against her based on her disabilities and / or perceived disabilities, and her parents' disabilities and / or perceived disabilities, in violation of 42 U.S.C. § 12203.

202.    Sacco seeks back pay and reinstatement or front pay, compensatory damages including for emotional distress, interest, attorneys' fees, and costs.

203.    In addition, because Cintas retaliated against Sacco with malice and / or reckless indifference to her rights under the ADA, she seeks punitive damages.

## SEVENTH CLAIM

### (Sex And Disability Discrimination Under The New York State Human Rights Law)

204.    Sacco repeats and realleges all of the allegations contained herein, as if separately alleged.

205.    Sacco is an "employee" under § 292 of the New York State Human Rights Law.

206.    Cintas is an "employer" under § 292 of the New York State Human Rights Law.

207.    Cintas discriminated against Sacco based on her sex and disability, by, among other things, causing to work in a hostile work environment based on her sex and disabilities and / or perceived disabilities, failing to grant her reasonable accommodations, unjustifiably and maliciously trying to cause her fear despite knowing she suffered from anxiety, and terminating her employment.

208.    As a result of Cintas' discriminatory actions, Sacco suffered significant damages, including lost wages and benefits and emotional distress, in amounts to be determined at trial.

## EIGHTH CLAIM

### (Retaliation Under The New York State Human Rights Law)

209.    Sacco repeats and realleges all of the allegations contained herein, as if separately alleged.

210.    Sacco is an "employee" under § 292 of the New York State Human Rights Law.

211.    Cintas is an "employer" under § 292 of the New York State Human Rights Law.

212.    Sacco engaged in protected activity under the New York State Human Rights Law by complaining and engaging in protected activity.

213.    Cintas unlawfully retaliated against Sacco by, among other things, failing to grant her reasonable accommodations, failing to engage in the interactive process, unjustifiably and maliciously trying to cause her fear despite knowing she suffered from anxiety, and terminating her employment.

214.    As a result of Cintas' actions, Sacco suffered significant damages, including lost wages and benefits and emotional distress, in amounts to be determined at trial.

33

## NINTH CLAIM

**(Discrimination, Less Well Treatment, And Hostile Work Environment
Based On Sex, Actual And / Or Perceived Disability,
And Association With An Actually And / Or Perceived Disabled Person
Under The New York City Human Rights Law, § 8-107(1)(a))**

215.    Sacco repeats and realleges all of the allegations contained herein, as if separately alleged.

216.    Sacco is a "person" under § 8-102(1) of the New York City Human Rights Law.

217.    Cintas is an "employer" under § 8-102(5) of the New York City Human Rights Law.

218.    Cintas discriminated against Sacco on the basis of her sex, actual and / or perceived disabilities, and her association with her actually and / or perceived to be disabled parents, by, among other things, failing to reasonably accommodate her disabilities, failing to engage in the interactive process, causing her to work in a hostile work environment based on her sex and disabilities and / or perceived disabilities, allowing her to be sexually harassed, issuing her an unwarranted warning, unjustifiably and maliciously trying to cause her fear despite knowing she suffered from anxiety, and terminating her employment.

219.    As a result of Cintas's discriminatory actions and less well treatment, Sacco suffered significant damages, including lost wages and benefits and emotional distress, in amounts to be determined at trial.

220.    Upon information and belief, Cintas engaged in this discriminatory conduct with malice and / or reckless indifference to Sacco's protected rights. Sacco is therefore entitled to punitive damages under the New York City Human Rights Law.

221.    As a result of Cintas's unlawful conduct, Cintas is also liable for attorneys' fees and costs.

34

## TENTH CLAIM

### (Unlawful Retaliation Under
### The New York City Human Rights Law, § 8-107(7))

222.    Sacco repeats and realleges all of the allegations contained herein, as if separately alleged.

223.    Sacco is a "person" under § 8-102(1) of the New York City Human Rights Law.

224.    C i n t a s  is an "employer" under § 8-102(5) of the New York City Human Rights Law.

225.    Sacco engaged in protected activity under the New York City Human Rights Law by complaining.

226.    As a result of Cintas's actions, Sacco has suffered substantial damages, including lost wages and benefits and emotional distress, in amounts to be determined at trial.

227.    Upon information and belief, Cintas engaged in this discriminatory conduct with malice and / or reckless indifference to Sacco's protected rights. Sacco is therefore entitled to punitive damages under the New York City Human Rights Law.

228.    As a result of Cintas's unlawful conduct, Cintas is also liable for attorneys' fees and costs.


## ELEVENTH CLAIM

### (Interference With Protected Rights Under
### The New York City Human Rights Law, § 8-107(19))

229.    Sacco repeats and realleges all of the allegations contained herein, as if separately alleged.

230.    Cintas's actions set forth above violated § 8-107(19) which sets forth that:

> Interference with protected rights. It shall be unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with, or attempt to

35

> coerce, intimidate, threaten or interfere with, any person in the exercise of enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected pursuant to this section.

## TWELFTH CLAIM

### (Liability Based On The New York City Human Rights Law, § 8-107(13)(b))

231. Sacco repeats and realleges all of the allegations contained herein, as if separately alleged.

232. By the actions of the individuals set forth above, Cintas is liable under § 8-107(13)(b), which sets forth that:

> An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where:
>
> (1) The employee or agent exercised managerial or supervisory responsibility; or
>
> (2) The employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where the conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or
>
> (3) The employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

233. Cintas knew of the discriminatory conduct, and acquiesced in such conduct and

36

failed to take immediate and appropriate corrective action.

234.   Cintas is liable for the above individuals' action and conduct.

## THIRTEENTH CLAIM

### (Cintas's Failure To Pay Owed Wages To Sacco, Violating The New York Labor Law)

235.   Sacco repeats and realleges all of the allegations contained herein, as if separately alleged.

236.   Cintas violated the New York Labor Law ("NYLL") by depriving Sacco of owed compensation, including unused PTO, and compensation for certain medical leave Sacco took that Cintas should have paid for.

237.   As a result of Cintas's violations of the New York Labor Law, Sacco has suffered damages by failing to receive her lawful wages. Additionally, Sacco is entitled to statutory damages, liquidated damages, prejudgment interest, and attorney's fees.

238.   By Cintas's knowing and intentional failure to pay Sacco owed compensation, Cintas has willfully violated the NYLL Art. 19 §§ 650 et seq. and the supporting New York State Department of Labor regulations.

239.   Cintas's actions in failing to compensate Sacco in accordance with NYLL was not in good faith.

240.   As a result of Cintas's violations of the New York Labor Law, Sacco has suffered damages by failing to receive her lawful wages. Additionally, Sacco is entitled to statutory damages, liquidated damages, prejudgment interest, and attorney's fees.

241.   By Cintas's knowing or intentional failure to pay Sacco's wages for all of the hours worked, Cintas has willfully violated the NYLL Art. 19 §§ 650 et seq. and the supporting New York State Department of Labor regulations.

242.    Cintas's actions in failing to compensate Sacco in accordance with NYLL was not in good faith.

## PRAYER FOR RELIEF

WHEREFORE, while reserving the right to seek additional damages as available, Sacco demands judgment against Cintas as follows:

1.    her actual damages in an amount to be determined at trial for loss of compensation and professional opportunities, including an award of back pay and lost benefits;

2.    an award of reinstatement or front pay in lieu of reinstatement;

3.    damages in an amount to be determined at trial to compensate Sacco for mental anguish, humiliation, embarrassment, and emotional injury;

4.    liquidated damages;

5.    punitive damages;

6.    an order enjoying Cintas from engaging in the wrongful practices alleged herein;

7.    award of reasonable attorneys' fees and the costs of this action; and

8.    such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: May 13, 2025

Law Office of Andrea Paparella, PLLC

By:    /s/ Andrea M. Paparella
Andrea M. Paparella
134 W. 29th Street, Suite 1001
New York, NY  10001-5304
Telephone Number: 617-680-2400
Facsimile Number: 914-462-3287
Email Address: amp@andreapaparella.com

38